# UNITED STATES DISTRICT COURT

**ORIGINAL**

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 5:18-MJ-00505 |
| 69831 Sunny Lane Cathedral City, California | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841, 846, 843(b), and 856(a)(1); Title 18, U.S.C., Section 924(c)(1)(A)(i) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mike Galvez, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 17, 2018

_____
*Judge's signature*

City and state: Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA Joseph Widman

## AFFIDAVIT

I, Michael Galvez, being duly sworn, declare and state as follows:

### I. PURPOSE OF THIS AFFIDAVIT

1. This affidavit is made in support of applications for warrants to search the following:

    a. A residence located at 69831 Sunny Lane, Cathedral City, California (the "SUBJECT RESIDENCE"), as further described in Attachment A-1, which is hereby incorporated by reference; and

    b. A 2015 blue Toyota Corolla, Florida License plate 9652IE, with vehicle identification number 2T1BURHE3FC336855 (the "SUBJECT VEHICLE A"), as further described in Attachment A-1, which is hereby incorporated by reference.[1]

2. The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of (1) Title 21, United States Code, Section 841, distribution and possession with intent to distribute a controlled substance, including Hashish Oil Containing Tetrahydrocannabinol; (2) Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance, including Hashish Oil Containing Tetrahydrocannabinol; (3) Title 21, United States Code, Section 843(b), unlawful use of a communication facility, including the mails and a cellular telephone, to facilitate the distribution of controlled

---

[1] The "SUBJECT VEHICLE" as that term is defined by the search warrant application of December 14, 2018 has not been located by the U.S. Postal Inspection Service.

substances; (4) Title 21, United States Code, Section 856(a)(1), maintaining a drug-involved premises; and (5) Title 18, United States Code, Section 924(c)(1)(A)(i), possession of firearms in furtherance of a drug trafficking crime, as more fully described in Attachment B, which is incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF POSTAL INSPECTOR MICHAEL GALVEZ

4.     I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2017.   I am currently assigned to the Los Angeles Division, San Bernardino External Crimes Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, related activity in connection with access devices (including credit and debit cards), and identity theft.   I completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of Mail theft, Bank fraud, and Identity Theft.   That course also included training in the

investigation of identity theft via the United States Mail. Through my training and experience, I am familiar with the ways in which criminals sending narcotics or illegal animals through the mail use cell phones and other digital devices to facilitate and conceal their crimes.

### III. SUMMARY OF PROBABLE CAUSE

5.    On Tuesday, December 11, 2018, United States Mail Carrier ("U.S. Mail Carrier") M.J. was assaulted and robbed of an express mail package.  On Friday, December 14, 2018, I obtained a search warrant to search the SUBJECT RESIDENCE for evidence of the assault on M.J.  The target of the investigation is Frederick Carl VICTORERO ("VICTORERO").

6.    Today, Monday, December 17, 2018, fellow law enforcement agents and I began to execute the warrant.  Upon entering the SUBJECT RESIDENCE, law enforcement officers found what appeared to be laboratory equipment and smelled marijuana, although they did not see any marijuana in plain sight.  They then identified a safe and opened the safe.  In the safe, law enforcement officers found what appeared to be pure THC extract (commonly known as "Honey Oil") as well as three firearms, two of which were loaded.

### IV.  DETAILED STATEMENT OF PROBABLE CAUSE

### A.   Previous Search Warrant Applications

7.    As referenced above, on December 14, 2018, I obtained search warrants to search the SUBJECT RESIDENCE as well as VICTORERO's car and person, for evidence of an assault on a federal employee, namely, U.S. Mail Carrier M.J.  (Case Nos.

3

5:18-MJ:00495, 5:18-MJ:00496, 5:18-MJ:00497.)  I have attached as Exhibit A an application with affidavit which the government submitted in support of its application to search the SUBJECT RESIDENCE.  Exhibit A is hereby incorporated by reference.

**B.   Entry into SUBJECT RESIDENCE**

8.   On December 17, 2018, at approximately 6:30 a.m., law enforcement officers entered the SUBJECT RESIDENCE pursuant to the search warrant.  Officers entered the SUBJECT RESIDENCE and went through the residence room to room.  Upon entering the residence, officers smelled marijuana, but they did not see any marijuana in plain sight.

9.   During the execution of the search warrant at the SUBJECT RESIDENCE, inspectors contacted both VICTORERO and his live-in girlfriend, Kayln Brown.  No one else was present during the execution of the search warrant.  Also, inspectors seized from VICTORERO a cellular telephone.  Inspectors also seized at least one other digital device, a laptop computer.

10.   While executing the search warrant, officers identified a safe in a spare bedroom on the southwest side of the SUBJECT RESIDENCE.  Officers opened the safe pursuant to the search warrant and found three containers of apparent "Honey Oil" and three firearms, two of which were loaded.[2]  (Inspectors found at least two additional firearms in the SUBJECT RESIDENCE, including what appeared to be an unloaded shotgun and an unloaded .22 caliber long rifle.)

---

[2] The safe contained additional material including coins, watches, and things of value, including a bar of apparent precious metal bullion.

11.   In an additional spare bedroom in the southwest side of the residence, officers saw a cylindrical metallic device attached to a pump, next to a couple empty glass containers. The room was lined with a blue plastic tarp on the floor and there was black material covering the window.  There was no bed or other indications of anyone using that room for any other apparent purpose.  It appears that none of the devices are currently connected to one another or to a power source.

12.   In the living room, officers found a black bag containing apparent manuals for operating chemical distillation equipment.

13.   In the garage, there were two pressurized cylinders and additional equipment that appeared to match the laboratory equipment seen in the spare bedroom.  Sergeant Tyson Voss of the Riverside County Sheriff's Department, who was present during the execution of the search warrant, told me that he saw what appeared to be THC/Honey Oil residue on some of the equipment found in the garage.  Also in the garage is SUBJECT VEHICLE A, parked adjacent to the equipment.[3]

14.   In the kitchen, inspectors found a package covered in white paper with return and sender addresses written on it,

_____

[3] VICTORERO made statements to the inspectors executing the search warrant, but the government is not relying on those statements to supports its showing of probable cause for this search warrant application. VICTORERO said that he was storing the equipment in question at the house and that he had transported it from Long Beach, California. Based upon a database regularly relied upon law enforcement, I have learned that the license plate of VICTORERO's car (the SUBJECT VEHICLE, as defined in the previous search warrant application) has been seen in Long Beach, California on approximately 20 occasions during the period May through August, 2018.

without postage.  The return address was "Mario Regaldo, 70610
Sunny Lane, Rancho Mirage, CA 92670" and the addressee is "Chris
Miller, 4566 E. Olive Ave., Lot #25, Fresno, CA 93702."  Based
upon my review of information publicly available on Google Maps,
it appears that 70610 Sunny Lane is an actual residence and
address and that it is approximately 0.8 miles away from the
SUBJECT RESIDENCE.  Next to the package was a blank U.S. Postal
Service Express Mail label.  As of this writing, the package has
not been opened.

15.  Inspectors found a letter dated October 1, 2018 from
the U.S. Postal Inspection Service addressed to Kayln Brown at
the SUBJECT RESIDENCE.  The letter advises that an "item placed
in the U.S. Postal Service mail stream is currently being
withheld from delivery as there are reasonable grounds to
believe its contents are non-mailable and possibly in violation
of the Federal Controlled Substances Act."

**C.   Training and Experience re: Honey Oil Production**

16.  Today I have spoken with several officials who are
knowledgeable about the THC/Honey Oil extraction and production
process, including Postal Inspector Kevin Lee, DEA Special Agent
James Breason,[4] and Sergeant Voss, all of whom have substantial

---

[4] I understand that SA Breason has been a Special Agent for
the Drug Enforcement Administration ("DEA") since March of 2009.
He is currently assigned to the Riverside County Sheriff's
Department ("RCSD") Special Investigation Bureau ("SIB") in
Riverside, California. Further, I understand that in the course
of SA Breason's employment with the DEA, he has received
approximately 20 weeks of training at the DEA Academy in
Quantico, Virginia about techniques used by major narcotics
traffickers.  He has specialized training involving the use,

experience in conducting controlled substance-related investigations, including investigations into marijuana-infused honey oil.  Inspector Lee and Sergeant Voss were present during all or part of the execution of the search warrant at the SUBJECT RESIDENCE.  Based upon my consultations with these officials, I understand that the equipment found at the SUBJECT RESIDENCE can be used and apparently, based upon the residue in equipment in the garage, has been used, in the production of Honey Oil.  Also, the additional spare bedroom in the southwest side of the residence appears to have been set up for the installation of a Honey Oil extraction operation or laboratory.

### V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

17.  Based upon information provided to me by DEA Special Agent James Breason, which is based upon his training and experience, I understand the following:

a.   Individuals who receive proceeds from drug trafficking generally maintain records of their illegal

---

possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques and conspiracy investigations.  He has attended 40 hours of Basic Clandestine Laboratory, 24 hours of Clandestine Laboratory Site Safety, and 24 hours of Clandestine Laboratory Level A training in the nomenclature and dismantling of Clandestine Laboratories.

I understand that SA Breason has participated in narcotics investigations as both a case agent and in a supportive role. He has assisted in the arrests of multiple drug traffickers.  He has also interviewed informants and suspects concerning the methods and means of drug traffickers.  He has participated in several static and mobile surveillance activities across Southern California and Northern New York and have assisted in the execution of multiple search warrants.  In addition, he has conducted investigations regarding the unlawful importation, possession, manufacturing, and distribution of controlled substances, as well as related money laundering.

7

transactions as items of value and usually keep them in places that are readily accessible, and under their physical control, such as a residence.  Individuals who receive proceeds from drug trafficking also keep these records on their cell phones/smart phones, computers, flash drives and portable hard drives and do not dispose of these records; they usually keep their records for long periods, often spanning several years.

b.    Individuals who receive proceeds from drug trafficking will keep the contact information of the individuals involved in their drug trafficking organization for future transactions or referrals.

c.    Drug traffickers also maintain records of drug shipments when using third party carriers such as FedEx.  It is common for the drug traffickers to maintain logs and/or ledgers to document their shipments, addresses for their customers, or tracking numbers associated to their drug parcels.

d.    People who receive proceeds from drug trafficking frequently possess firearms, ammunition, and other dangerous weapons to protect their profits and persons from others who might attempt to forcibly take such items and/or harm them during transactions.  Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

e.    Much correspondence related to buying and selling drugs, including the handling of drug-related money, occurs by

phone, e-mail and text messages sent to and from smart phones, laptops, or other digital devices.  This includes sending photos of the drugs or currency between the seller and the buyer, as well as negotiation of price.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.   As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  REQUEST TO SEAL

21.   I request the sealing of the search warrants and accompanying affidavits, and applications in support thereof, as they reveal an ongoing investigation, and in order to avoid

premature disclosure of the investigation, reduce the risk of destruction or tampering with evidence, reduce the risk of intimidation of potential witnesses, guard against the flight of suspects, and better ensure the safety of agents and others, except that copies of the search warrants and arrest warrant in full or redacted form may be maintained by the United States Attorney's Office, may be served on Special Agents and other investigative and law enforcement officers, as necessary to effectuate the warrant, and may be provided as otherwise required by law.

///

///

## VIII.     CONCLUSION

22.   Based on the foregoing facts, there is probable cause
to believe that evidence, fruits, and instrumentalities of the
offense listed in Attachment B will be found at the SUBJECT
RESIDENCE and in SUBJECT VEHICLE A, as further described in
Attachments A-1 and A-2.

_____
MICHAEL GALVEZ, Postal
Inspector
United States Postal Inspection
Service

Subscribed to and sworn before
me this 17th day of December,
2018

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### SUBJECT RESIDENCE

PREMISES TO BE SEARCHED

The premises located at 69831 Sunny Lane, Cathedral City, California (the "SUBJECT RESIDENCE").  The SUBJECT RESIDENCE is white in color with a dark blue trim.  The SUBJECT RESIDENCE has two windows facing the street with dark blue trim.  The SUBJECT RESIDENCE has a garage on the east side.  The numbers "69831" are located on the east side of the front door.  The SUBJECT RESIDENCE has drought tolerant landscaping in the form of rock and gravel.   The area to be searched includes all vehicles on or adjacent to the SUBJECT RESIDENCE registered to or under the control of FREDERICK CARL VICTORERO.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

  1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of (1) Title 21, United States Code, Section 841, distribution and possession with intent to distribute a controlled substance, including Hashish Oil Containing Tetrahydrocannabinol; (2) Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance, including Hashish Oil Containing Tetrahydrocannabinol; (3) Title 21, United States Code, Section 843(b), unlawful use of a communication facility, including the mails and a cellular telephone, to facilitate the distribution of controlled substances; (4) Title 21, United States Code, Section 856(a)(1), maintaining a drug-involved premises; and (5) Title 18, United States Code, Section 924(c)(1)(A)(i), possession of firearms in furtherance of a drug trafficking crime, namely:

  a.   Controlled substances, including Hashish Oil Containing Tetrahydrocannabinol;

  b.   Equipment used in the production and extraction of THC from marijuana;

  c.   Records, materials, or documents regarding the production and extraction of THC from marijuana;

  d.   Records, materials, or documents reflecting communications regarding the production and extraction of THC from marijuana, including regarding equipment used in the production and extraction of THC from marijuana;

ii

e.   U.S. Mail, Express Mail, Priority Mail, United Parcel Service (UPS), Federal Express, UPS or other private shipping service's delivery confirmation slips, labels and associated boxes;

f.   Any cash-counting machines;

g.   Any materials used in the packaging and/or concealment of currency/narcotics for shipment, including aluminum foil, carbon paper, duct tape, clear shipping tape, and heat sealed bags.

h.   Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the premises, including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, clothing, personal affects, and other mailed envelopes reflecting the address and addressee;

i.   Firearms, firearm parts, firearm magazines;

j.   Firearm ammunition;

k.   Data, records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when controlled substances were bought, sold or otherwise distributed;

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.   evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

              viii.      records of or information about Internet Protocol addresses used by the device;

              ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

vi

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.